UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

SUPERIOR BIOLOGICS NY, INC.,

                                        Plaintiff,

                    v.

AETNA, INC. *et al.*,

                                        Defendants.

No. 20-CV-5291 (KMK)

OPINION & ORDER

---

Appearances:
Bridget A. Gordon, Esq.
Devin M. Senelick, Esq.
Hooper, Lundy & Bookman, P.C.
Los Angeles, CA
*Counsel for Plaintiff*

Colleen Michele Tarpey, Esq.
Kevin Gerard Donoghue, Esq.
Garfunkel Wild, P.C.
Great Neck, NY
*Counsel for Plaintiff*

Earl B. Austin, Esq.
Sarah Reeves, Esq.
Baker Botts L.L.P.
New York, NY
*Counsel for Defendants*

KENNETH M. KARAS, District Judge:

        Plaintiff Superior Biologics NY, Inc. ("Superior" or "Plaintiff") brings this Action

against Aetna, Inc., Aetna Health, Inc., Aetna Health Insurance Company of New York, and

Aetna Better Health, Inc., and Does 1–20 ("Does"; collectively, "Aetna" or "Defendants")

alleging two claims: 1) breach of Plaintiff's patients' health benefits plan in violation of the

Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132(a)(1)(B); and 2)

promissory estoppel under New York law.  (*See generally* Am. Compl. (Dkt. No. 47).)  Before the Court is Defendants' Motion To Dismiss the Amended Complaint pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) (the "Motion").  (*See* Not. of Mot. (Dkt. No. 62).)  For the following reasons, Defendants' Motion is granted.

## I.  Background

### A.  Factual Background

The following facts are drawn from Plaintiff's Amended Complaint and are taken as true for the purpose of resolving the instant Motion.

Defendants insure, operate, and administer healthcare plans in New York.  (Am. Compl. ¶ 16.)  In exchange for premiums and/or fees or other compensation, Aetna pays for healthcare services rendered to Aetna members, including the healthcare services Plaintiff provided and continues to provide to Aetna members.  (*Id.*)  Aetna is the claims administrator for various healthcare plans under ERISA, including plans for Deutsche Bank Americas Holding Corp. ("Deutsche Bank"), Fast Retailing USA, Inc. ("Fast Retailing"), Altria Client Services, LLC ("Altria"), the Fashion Institute of Technology ("FIT"), TriNet Group, Inc. ("TriNet"), and Mason Tenders District Council Welfare Fund ("Mason"), among others (collectively, the "ERISA Plans").  (*Id.* ¶ 7.)  Aetna had sole and absolute discretion to deny the payment of benefits to Plaintiff.  (*Id.* ¶ 8.)

Plaintiff provides pharmacological treatments to patients.  (*Id.* ¶ 15.)  The treatments include the provision of intravenous immunoglobulin ("IVIg") drugs and therapies, which are used to treat various autoimmune and other disorders.  (*Id.*)  Plaintiff was an out-of-network provider because Plaintiff was not a party to a written contract with Aetna setting reimbursement rates for the services it provides.  (*Id.* ¶ 14.)

2

This case concerns seven Aetna members to whom Plaintiff provided services, and all of the patients at issue in this suit were covered Aetna members at the time services were provided. (*Id.* ¶¶ 15, 16.)  Plaintiff alleges that prior to rendering services to patients, Plaintiff called the insurance company to verify that the patient was covered, the terms of the patient's coverage, and, if necessary, to obtain prior authorization from the insurance company.  (*Id.* ¶ 17.)  For the patients at issue in this lawsuit, Plaintiff "specifically verified with Aetna that the patient had coverage, and that all billing codes were valid and covered by the patient's health plan."  (*Id.* ¶ 18.)  When Plaintiff called on behalf of each patient, Aetna advised Plaintiff that no prior authorization was required prior to treatment.  (*Id.*)  Plaintiff submitted claims for reimbursement only after verifying coverage, getting any necessary authorization, and after the services had been provided.  (*Id.* ¶ 19.)  Plaintiff alleges that for each of the patient claims at issue here, Plaintiff adhered to this process.  (*Id.*)  This arrangement was of "tremendous benefit to both the patient and Aetna, neither of whom has to pay the entire bill before Plaintiff provides services." (*Id.*)

Plaintiff alleges that, at all times, it billed Aetna directly for out-of-network claims arising from Plaintiff's treatment of Aetna members.  (*Id.* ¶ 20.)  Aetna accepted and received Plaintiff's bills for the healthcare services Plaintiff provided to Aetna members.  (*Id.* ¶ 21.) While Aetna routinely reimbursed Plaintiff for the cost of the nurse's labor and supplies used to administer the drugs, Aetna routinely refused to pay for the actual drugs being administered by those same nurses.  (*Id.*)  Plaintiff alleges that Defendants' refusal to pay is directly in violation of the terms of the members' ERISA Plans.  (*Id.* ¶ 22.)

The ERISA Plans explicitly cover IVIg drugs and therapies and indicate that such drugs must be paid at certain rates.  (*Id.*)  Specifically, the Deutsche Bank Plan covers outpatient

infusion therapy, including the pharmaceutical itself as well as any medical supplies, equipment, and nursing services required to support the infusion therapy.  (*Id.* ¶ 23.)  The Altria Plan covers prescription drugs.  (*Id.* ¶ 24.)  The Fast Retailing Plan covers specialty prescription drugs when they are "purchased by [the member's] provider, injected or used by [the member's] provider in an outpatient setting . . .  and the drug is listed on [the plan's] specialty prescription drug list . . . ."  (*Id.* ¶ 25.)  The FIT Plan covers outpatient infusion therapy.  (*Id.* ¶ 26.)  The plan covers the pharmaceutical itself and any medical supplies, equipment, and nursing services required to support the infusion therapy.  (*Id.*)  Under the TriNet Plans, outpatient infusion therapy is a specifically covered benefit.  (*Id.* ¶ 27.)  The TriNet Plans also note that the pharmaceutical itself and any medical supplies, equipment, and nursing services required to support the infusion therapy are covered.  (*Id.*)  Additionally, Plaintiff alleges that the FIT Plan and TriNet Plans also require that Aetna pay for the reasonable and customary value of the drugs and services provided.  (*Id.* ¶ 28.)

Plaintiff alleges that, despite repeated demands and appeals, Aetna refuses to reimburse Plaintiff for the full amount of costs it is owed under the ERISA plans.  (*Id.* ¶ 29.)  Plaintiff seeks damages equal to the difference between the amounts the members' ERISA Plans require Aetna to pay and the amounts actually paid by Aetna, plus the Plaintiff's loss of use of that money.  (*Id.*)  Plaintiff alleges that Aetna has underpaid Plaintiff in an aggregate amount of at least $3.4 million, plus applicable interest.  (*Id.* ¶ 36.)

B.  Procedural History

Plaintiff filed its Complaint on July 9, 2020.  (Dkt. No. 1.)  On March 19, 2021, the Parties filed a stipulation and agreement extending the Plaintiff's time to file an Amended Complaint, (Dkt. No. 46), which Plaintiff filed on April 19, 2021, (Dkt. No. 47).  On May 3,

4

2021, Defendants filed a letter outlining the grounds for their anticipated Motion To Dismiss. (Dkt. No. 50.)  Plaintiff replied on May 7, 2021.  (Dkt. No. 52.)  The Court held a teleconference on June 7, 2021, during which the Court instructed the Parties to file supplemental pre-motion letters after the completion of discovery.  (*See* Dkt. (minute entry for June 7, 2021).)  After the Parties completed discovery, the parties filed their supplemental pre-motion letters on August 20, 2021.  (Dkt. Nos. 57, 58.)  On September 15, 2021, the Court adopted the Parties' proposed briefing schedule for Defendant's Motion To Dismiss.  (Dkt. Nos. 60, 61.)  On October 29, 2021, Defendants filed its Motion To Dismiss and accompanying papers.  (Dkt. Nos. 62–64.)  On December 3, 2021, Plaintiff filed an Opposition to Defendants' Motion To Dismiss and accompanying papers. (Dkt. Nos. 65, 66.)  On December 17, 2021, Defendants filed a Reply and accompanying papers.  (Dkt. Nos. 67, 68.)

## II.  Discussion

### A.  Standard of Review

"The standards of review for a motion to dismiss under Rule 12(b)(1) for lack of subject matter jurisdiction and under 12(b)(6) for failure to state a claim are 'substantively identical.'" *Gonzalez v. Option One Mortg. Corp.*, No. 12-CV-1470, 2014 WL 2475893, at *2 (D. Conn. June 3, 2014) (quoting *Lerner v. Fleet Bank, N.A.*, 318 F.3d 113, 128 (2d Cir. 2003)).  The only substantive difference is "that the party invoking the jurisdiction of the court has the burden of proof in a 12(b)(1) motion, in contrast to a 12(b)(6) motion, in which the defendant has the burden of proof."  *Lerner v. Fleet Bank, N.A.,* 318 F.3d at 128 (citing *Thompson v. Cnty. of Franklin,* 15 F.3d 245, 249 (2d Cir.1994)); *see also, e.g.*, *Langella v. Bush,* 306 F.Supp.2d 459, 463 (S.D.N.Y. 2004) ("On a motion to dismiss pursuant to Rule 12(b)(1), plaintiff carries the

burden of establishing that subject matter jurisdiction exists over his complaint."); *Bishop v. Porter*, 2003 WL 21032011 at *3.

"Where, as here, the defendant moves for dismissal under Rule 12(b)(1), Fed. R. Civ. P., as well as on other grounds, the court should consider the Rule 12(b)(1) challenge first." *MMA Consultants 1, Inc. v. Republic of Peru*, 245 F. Supp. 3d 486, 497 (S.D.N.Y. 2017), *aff'd*, 719 F. App'x 47 (2d Cir. 2017); *United States v. N.Y.C. Dep't of Hous., Pres. & Dev.*, No. 09-CV-6547, 2012 WL 4017338, at *3 (S.D.N.Y. Sept. 10, 2012) (quoting *Rhulen Agency, Inc. v. A.L. Ins. Guar. Ass'n*, 896 F.2d 674, 678 (2d Cir. 1990)); *see also Stahl York Ave. Co., LLC v. City of New York*, No. 14-CV-7665, 2015 WL 2445071, at *7 (S.D.N.Y. May 21, 2015).

### 1. Rule 12(b)(1)

"A federal court has subject matter jurisdiction over a cause of action only when it has authority to adjudicate the cause pressed in the complaint." *Bryant v. Steele*, 25 F. Supp. 3d 233, 241 (E.D.N.Y. 2014) (quotation marks omitted). "Determining the existence of subject matter jurisdiction is a threshold inquiry[,] and a claim is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Morrison v. Nat'l Austl. Bank Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008), *aff'd*, 561 U.S. 247 (2010); *United States v. Bond*, 762 F.3d 255, 263 (2d Cir. 2014) (describing subject matter jurisdiction as the "threshold question") (quotation marks omitted)).

The Second Circuit has explained that a challenge to subject-matter jurisdiction pursuant to Rule 12(b)(1) may be facial or fact-based. *See Carter v. HealthPort Techs.*, LLC, 822 F.3d 47, 56 (2d Cir. 2016). When a defendant raises a facial challenge to standing based solely on the complaint and the documents attached to it, "the plaintiff has no evidentiary burden," *id.* (citing (*Amidax Trading Grp. v. S.W.I.F.T. SCRL*, 671 F.3d 140, 145 (2d Cir. 2011))), and a court must

determine whether the plaintiff asserting standing "alleges facts that affirmatively and plausibly suggest that the plaintiff has standing to sue," *id.* (alterations omitted) (quoting *Selevan v. N.Y. Thruway Auth.*, 584 F.3d 82, 88 (2d Cir. 2009)).  In making such a determination, a court must accept as true all allegations in the complaint and draw all inferences in the plaintiff's favor.  *Id.* at 57.  However, where a Rule 12(b)(1) motion is fact-based and a defendant proffers evidence outside the pleadings, a plaintiff must either come forward with controverting evidence or rest on the pleadings if the evidence offered by the defendant is immaterial.  *See Katz v. Donna Karan Co.*, 872 F.3d 114, 119 (2d Cir. 2017).  "If the extrinsic evidence presented by the defendant is material and controverted, the . . . court must make findings of fact in aid of its decision as to standing."  *Carter*, 822 F.3d at 57; *see also*, *Contec, LLC v. Commc'ns Test Design, Inc.,* No. 18-CV-1172, 2019 WL 4736455, at *1 (N.D.N.Y. Sept. 27, 2019) ("[W]hen a question of the [d]istrict [c]ourt's jurisdiction is raised . . . the court may inquire, by affidavits or otherwise, into the facts as they exist.") (quoting *Land v. Dollar*, 330 U.S. 731, 735 n.4 (1947)); *Faucette v. Colvin*, No. 15-CV-8495, 2016 WL 866350, at *2 n.5 (S.D.N.Y. Mar. 3, 2016) (same).

### 2. Rule 12(b)(6)

The Supreme Court has held that although a complaint "does not need detailed factual allegations" to survive a motion to dismiss, "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (alteration and quotation marks omitted).  Indeed, Rule 8 of the Federal Rules of Civil Procedure "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement."  *Id.* (alteration and quotation marks omitted).  Rather, a

complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.  Although "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint," *id.* at 563, and a plaintiff must allege "only enough facts to state a claim to relief that is plausible on its face," *id.* at 570, if a plaintiff has not "nudged [his] claim[ ] across the line from conceivable to plausible, the[ ] complaint must be dismissed," *id.*; *see also Iqbal*, 556 U.S. at 679 ("Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.  But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.' " (second alteration in original) (citation omitted) (quoting Fed. R. Civ. P. 8(a)(2))); *id.* at 678–79 ("Rule 8 marks a notable and generous departure from the hypertechnical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.").

"[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint," *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam), and "draw all reasonable inferences in the plaintiff's favor," *Div. 1181*, 9 F.4th at 95 (citation omitted).  Additionally, "[i]n adjudicating a Rule 12(b)(6) motion, a district court must confine its consideration to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken."  *Leonard F. v. Isr. Disc. Bank of N.Y.*, 199 F.3d 99, 107 (2d Cir. 1999) (quotation marks omitted); *see also Wang v. Palmisano*, 157 F. Supp. 3d 306, 317 (S.D.N.Y. 2016) (same).

B. Analysis

As noted, the Court is to start its analysis with a discussion of Defendants' 12(b)(1)
Motion To Dismiss. *See MMA Consultants*, 245 F. Supp. 3d at 497. Defendants argue that
Plaintiff does not have standing to bring this lawsuit for several reasons. (Defs.' Mem. of Law in
Supp. of Mot. for Summ. J. ("Defs.' Mem.") 4 –11 (Dkt. No. 63).) The Court will address each
reason as necessary to resolve the instant Motion.

1. Anti-Assignment

First, Defendants argue that Plaintiff does not have standing because the ERISA Plans all
contain an anti-assignment provision, such that Plaintiff cannot sue for the value of healthcare
services provided to the patients under their healthcare plans with Aetna. (*Id.* at 5.) Plaintiff
argues that granting the Motion is not proper at this stage of the litigation because Aetna has only
produced partial excerpts of the ERISA Plans, and this "cherry-pick[ing]" may affect the Court's
interpretation of them. (*See* Pl.'s Mem. of Law in Opp'n to Defs.' Mot. To Dismiss ("Pl.'s
Opp'n.") 10 (Dkt. No. 65).) Plaintiff thus appears to suggest that additional discovery is
required. (*See id.*)

The Federal Rules of Civil Procedure give district courts broad discretion to manage the
manner in which discovery proceeds. *See In re Subpoena Issued to Dennis Friedman*, 350 F.3d
65, 69 (2d Cir. 2003). In particular, Rule 26(b)(2)(C) permits a district court to "limit the
frequency or extent of use of the discovery methods otherwise allowed by [the federal] rules" if
it determines that (1) "the discovery sought is unreasonably cumulative or duplicative," or more
readily obtainable from another source; (2) the party seeking discovery already has had ample
opportunity to obtain the information sought; or (3) the burden or expense of the proposed
discovery outweighs its likely benefit. Fed. R. Civ. P. 26(b)(2)(C)(i)-(iii).

However, in reply to Plaintiff's Opposition, Aetna produced the entirety of the ERISA Plan documents that Plaintiff referenced in its Amended Complaint. (*See* Decl. of Anita Everett ("Everett Decl.") Exs. A–F (Dkt. Nos. 68-1 –68-6).) Further, the Court ordered discovery to be completed by July 31, 2021, during which time Plaintiff had ample opportunity to obtain the Plan documents. (*See* Dkt. (minute entry for June 7, 2021).) Aetna further notes that it produced over 6,000 pages of documents for Plaintiff. (Defs.' Reply Mem. of Law in Supp. of Mot. To Dismiss Pl.'s Am. Compl. ("Defs.' Reply") 2 n.2 (Dkt. No. 67).).

Plaintiff relies on *Total Renal Care of N. Carolina, L.L.C. v. Fresh Mkt., Inc.*, 457 F. Supp. 2d 619 (M.D.N.C. 2006), where the court allowed limited discovery when the defendant "cherry-picked" anti-assignment language. *Id.* at 623. In *Total Renal Care,* the plaintiff neither received the actual Plan documents, nor did the defendants ever submit the actual plans to the court. *See id.* Further, the plaintiff did not have the opportunity to properly review the applicable provisions or pursue any discovery related to the provisions. *See id.* The plaintiff also alleged that defendants "changed some of the wording of its anti-assignment provision during the applicable time period." *Id.* Unlike in *Total Renal Care*, Defendants in this case submitted the entirety of the Plans to Plaintiff. (*See* Everett Decl.) Plaintiff thus had an opportunity to pursue discovery of the provisions and review the provisions. (See Dkt. (minute entry for June 7, 2021).) Further, unlike in *Total Renal Care*, Plaintiff does not allege that Aetna changed the wording of the provisions. (*See generally* Pl.'s Opp'n.) Considering all these factors, the Court finds that additional discovery would be unnecessary here. Accordingly, the Court will determine whether Plaintiff has standing pursuant to Rule 12(b)(1) based on the anti-assignment provisions included in the attached Plan documents.

2. Authentication

Plaintiff also argues that the Plan excerpts that have been submitted were not authenticated by any representative of Aetna, and thus the evidence cannot be considered by the Court. (*See id.* at 10.)  "[I]t is unquestionable that this [C]ourt has the inherent authority to resolve the disputed issue of the [Plan documents'] authenticity, an issue of fact that is critical to establishing whether Plaintiff has presented an actionable case or controversy over which the court may exercise its jurisdiction, that in making such determination the [C]ourt may rely on matters outside the pleadings, including all submissions by the parties, and may, but is not required to, hold an evidentiary hearing if necessary." *Ceglia v. Zuckerberg*, No. 10-CV-00569, 2013 WL 1208558, at *12 (W.D.N.Y. Mar. 26, 2013), *report and recommendation adopted*, 2014 WL 1224574 (W.D.N.Y. Mar. 25, 2014), *aff'd*, 600 F. App'x 34 (2d Cir. 2015) (quotation marks omitted) (finding no hearing necessary and determining "neither [the] [p]laintiff's Seventh Amendment right to a jury trial, nor Rules 901 or 1008 of the Federal Rules of Evidence pose any impediment to the court's authority to resolve the issue of the [disputed document's] authenticity on [the] [d]efendants' [m]otion to [d]ismiss.").

Under Federal Rule of Evidence 901(a), "[t]o satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Fed. R. Evid. 901(a).  Under Rule 901(b), testimony of a witness with knowledge provides appropriate authentication.  Fed. R. Evid. 901(b).  Here, Defendants submitted a declaration from Anita Everett ("Everett"), a supervisor at Aetna, attesting that the provided Plan Documents are authentic.  (*See* Everett Decl. ¶¶ 1–10.)  Everett's attestation under these circumstances is sufficient.  *See Com. Data Servers, Inc. v. Int'l Bus. Machines Corp.*, 262 F. Supp. 2d 50, 58–59 (S.D.N.Y. 2003) (finding that

11

documents were authentic when an attorney representing the firm had personal knowledge that the documents were obtained during discovery and submitted a declaration that these documents were true and correct copies); *see also Fraser v. United States*, 490 F. Supp. 2d 302, 308 (E.D.N.Y. 2007) (holding that the Government had properly authenticated a contract when the Government submitted an affidavit attesting to its authenticity).

In addition, under Rule 901(b)(4), authentication is provided by "appearance, contents, substance, internal patterns, or other distinctive characteristics, taken in conjunction with the circumstances." Fed. R. Evid. 901(b)(4). "Plaintiff . . . has not objected that the exhibits are *not authentic,* just that they are *not authenticated.*" *Com. Data Servers, Inc.*, 262 F. Supp. 2d at 59 (emphasis in original); *see also InspiRx, Inc. v. Lupin Atlantis Holdings SA*, 554 F. Supp. 3d 542, 559 (S.D.N.Y. 2021); *cf. Villalba v. Robo-Breaking Co.*, No. 11-CV-1030, 2014 WL 4829280, at *8 & n.11 (E.D.N.Y. Sept. 29, 2014) (finding, at the summary judgment stage, a photograph to have been sufficiently authenticated by the plaintiff and plaintiff's colleague and "find[ing] it notable that [the defendant] contests the [p]laintiff's ability to authenticate the picture, but never directly questions the authenticity of the photograph itself"). Therefore, the Court finds the Plan excerpts to be authentic.

### 3. Assignee

A civil action may be brought by health plan participants and beneficiaries to recover plan benefits under Section 502(a)(1)(B) of ERISA. *See Neuroaxis Neurosurgical Assocs., PC v. Costco Wholesale Co.*, 919 F. Supp. 2d 345, 350 (S.D.N.Y. 2013) (citing 29 U.S.C. § 1132); *see also Simon v. General Elec. Co.*, 263 F.3d 176, 177 (2d Cir. 2001). The terms "participant" and "beneficiary" are defined in the ERISA statute. A "participant" is "any employee or former employee of an employer, or any member or former member of an employee organization, who

is or may become eligible to receive a benefit of any type from an employee benefit plan which covers employees of such employer or members of such organization, or whose beneficiaries may be eligible to receive any such benefit." 29 U.S.C. § 1002(2)(B)(7); *see also Simon*, 263 F.3d at 177.  A "beneficiary" is "a person designated by a participant, or by the terms of an employee benefit plan, who is or may become entitled to a benefit thereunder." 29 U.S.C. § 1002(2)(B)(8); *see also Simon*, 263 F.3d at 177.

"While only an ERISA 'participant or beneficiary' may bring a claim for benefits under ERISA, a 'narrow exception' exists for 'healthcare providers to whom a beneficiary has assigned his claim in exchange for health care.'" *Neurological Surgery, P.C. v. Aetna Health Inc*., 511 F. Supp. 3d 267, 281–82 (E.D.N.Y. 2021) (quoting *Montefiore Med. Ctr. v. Teamsters Loc. 272*, 642 F.3d 321, 328–29 (2d Cir. 2011) and citing 29 U.S.C. § 1132(a)(1)(B)).  "Thus, a provider who asserts a claim as an assignee of a participant or beneficiary to an ERISA plan has standing to sue if the litigant has a colorable claim to that status." *Neuroaxis*, 919 F. Supp. 2d at 351.  To prevail on an ERISA claim, the assignee must therefore establish the existence of a valid assignment.  *See id.*  "[B]ecause ERISA instructs courts to enforce strictly the terms of plans, an assignee cannot *collect* unless he establishes that the assignment comports with the plan." *Id.* (citation omitted) (emphasis in original).  However, "[v]alid anti-assignment provisions render [a] [p]laintiff's 'acceptance of [the] assignment . . . ineffective—a legal nullity.'" *Neurological Surgery*, 511 F. Supp. 3d at 282 (quoting *McCulloch Orthopaedic Surgical Servs., PLLC v. Aetna Inc.*, 857 F.3d 141, 147 (2d Cir. 2017)).

Here, each of the Plans contains some version of an anti-assignment clause.  These clauses limit the right to assign a claim in two ways: they either (1) bar assignment completely or

(2) require written consent of Aetna.  First, the Deutsche Bank and FIT Plans bar assignment completely.  For instance, the Deutsche Bank Plan states:

> Your right to receive benefits under the Medical Plan and Vision Plan is personal to you and you do not have the right to assign . . . any benefits under these Plans to which you are entitled. You are not permitted to (a) assign, in whole or in part, to any party, including without limitation, to a health care provider, your right to any benefits under the Medical Plans or (b) assign any administrative, statutory, or legal right,  or cause of action that you may have under ERISA  or any other federal or state statute or regulation, including without limitation, any right to file a claim for benefits or an appeal of a denial of claim for benefits . . . or to file a lawsuit under ERISA.  Any attempt to assign, in whole or in part, such rights or any benefits shall be void and unenforceable under all circumstances.

(Everett Decl. Ex. A ("Deutsche Bank Plan") 86 (Dkt. No. 68-1).)  Similarly, the FIT Plan states, "Coverage and your rights under this plan may not be assigned."  (Everett Decl. Ex. D ("FIT Plan") 62 (Dkt. No. 68-4).)  Such clauses render any purported assignment void.  *See Neuroaxis*, 919 F. Supp. 2d at 353–54 (holding that the clause reading "[a]ll rights of the member to receive benefits hereunder are personal to the member and may not be assigned" rendered any purported assignment void); *see also City of Hope Nat. Med. Ctr. v. HealthPlus, Inc.*, 156 F.3d 223, 229 (1st Cir. 1998) (holding the language "[a]ll entitlements of a member to receive covered rights are personal and may not be assigned" prohibited the plan participant from assigning her rights to the healthcare provider and, as a result, the defendant insurance carrier was entitled to judgment as a matter of law).

Second, the Fast Retailing Plan, the Altria Plan, and the two TriNet Plans require Aetna's written consent before assignment.  For instance, the Fast Retailing Plan provides:

> When you see an out-of-network provider, we may choose to pay you or to pay the provider directly. Unless we have agreed to do so in *writing* and to the extent allowed by law, we will not accept an assignment to an out-of-network provider or facility under this plan.

14

(Everett Decl. Ex. B ("Fast Retailing Plan") 79 (Dkt. No. 68-2) (emphasis added).)  The Altria

Plan and the two TriNet Plans state, "Coverage may be assigned only with the written consent of

Aetna."  (Everett Decl. Ex. C ("Altria Plan") 59 (Dkt. No. 68-3); Everett Decl. Ex. E ("TriNet

Plan (2014-15)") 71 (Dkt. No. 68-5); Everett Decl. Ex. F ("TriNet Plan (2015-16)") 68 (Dkt. No.

68-6).)  The plain meaning of these written consent clauses is that assignments are prohibited

without the *written* consent of Aetna, and the Parties appear to agree that Aetna did not provide

written consent.  (*See, e.g.*, Pl.'s Opp'n 7.)  Plaintiff instead asserts that Aetna has consented to

assignment through its repeated conduct of making payment directly to Superior.  (*See id.*)

Plaintiff cites *Protocare of Metro. N.Y., Inc. v. Mut. Ass'n Adm'rs, Inc.*, 866 F. Supp. 757

(S.D.N.Y. 1994), in which the court reasoned that because a plan with an anti-

assignment provision "also provide[d] for the possibility of direct payment to the health care

provider," the plan could not be read to "prevent all assignments."  *Id.* at 761–62; *see*

*also Biomed Pharm., Inc. v. Oxford Health Plans (N.Y.), Inc.*, No. 10-CV-7427, 2011 WL

803097, at *5 (S.D.N.Y. Feb. 18, 2011) (reasoning that the existence of a direct payment

provision in a plan with an anti-assignment clause "at the very least[] creates an ambiguity

within the contract that should be construed against the drafter").  Plaintiff also relies on

*Neuroaxis Neurosurgical Assoc., PC v. Cigna Healthcare of New York, Inc.*, 11-CV-8517, 2012

WL 4840807 (S.D.N.Y. Oct. 4, 2012), in which the court held that a healthcare provider's long-

standing pattern and practice of direct payment to the plaintiff was sufficient to show its consent

to the plaintiff's assignments.  *Id.* at *3.

Defendant argues that *Neuroaxis* is distinguishable because in that case, the plan did not

require insurance company's written consent for assignment.  (Defs.' Reply at 3.)  The Court

agrees that *Neuroaxis* is distinguishable from this case, because in *Neuroaxis*, the plan's

language was as follows: "Medical benefits are not assignable unless agreed to by [the health provider]." *Neuroaxis,* 2012 WL 4840807 at *3.  Because there was no written consent requirement, the health provider in *Neuroaxis* was able to consent through its conduct.  *See id.* Here, by contrast, although the Fast Retailing Plan, the Altria Plan, and the two TriNet Plans allow direct payment to service providers, those plans also require Aetna's written consent before an assignment can be made.  (Fast Retailing Plan 79; Altria Plan 61; TriNet Plan (2014-15) 71, 74; TriNet Plan (2015-16) 68, 71.)

The more recent trend in this District, however, is that a court can give effect to both an anti-assignment and a direct payment clause in the plan.  *See Med. Socy. of N.Y. v. UnitedHealth Grp. Inc.*, No. 16-CV-5265, 2019 WL 1409806, at *9 (S.D.N.Y. Mar. 28, 2019) (holding that an anti-assignment clause was effective despite direct payment clause); *Merrick v. UnitedHealth Group Inc.*, 175 F. Supp. 3d 110, 120–22 (S.D.N.Y. 2016) (same); *Neuroaxis*, 919 F. Supp. 2d at 355 ("[T]he fact that [an insurer] has reserved for itself the right to make direct payments to healthcare providers does not suggest that the [p]lan members also have the right to unilaterally assign rights to healthcare providers.").

The Court elects to follow the more recent trend and give effect to both the anti-assignment and direct payment provisions in the Fast Retailing, Altria, and TriNet Plans "by interpreting the concepts of assigning rights and of directly paying service providers not to be coterminous."  *Med. Socy. of N.Y.*, 2019 WL 1409806, at *9.  "Indeed, it is necessary to interpret the provisions according to their plain meaning and give effect to both.  To do otherwise would 'create an ambiguity where none exists,' . . . which would be an improper interpretation under ERISA."  *Id.* (citing *Merrick*, 175 F. Supp. 3d at 122 and *Burke v. PriceWaterHouseCoopers LLP Long Term Disability Plan*, 572 F.3d 76, 81 (2d Cir. 2009) ("[A]

court must not rewrite, under the guise of interpretation, a term of the contract when the term is clear and unambiguous." (citations omitted))).

In sum, as to the Deutsche Plan and FIT Plan, there is no language that allows Aetna's direct payment of benefits to a health care provider.  (*See generally* Deutsche Plan; FIT Plan.) Thus, there is no ambiguity that these Plans bar assignment, and thus Aetna cannot consent to an assignment through its conduct of making payment directly to the assignees.  The Fast Retailing, Altria, and TriNet Plans may allow for direct payment, but they also require written consent for assignment.  (*See* Fast Retailing Plan 79; Altria Plan 59; TriNet Plan (2014-15) 10, 74; TriNet Plan (2015-16) 71.)  The Court concludes that the anti-assignment clauses in the plans at issue are not rendered ambiguous nor negated by the existence of direct payment provisions.  Thus, Aetna's conduct of making payment directly to Plaintiff does not constitute consent to an assignment.

### 4. Waiver

"Although the Second Circuit has not specifically addressed whether a plan administrator can waive its right to enforce an anti-assignment provision, it has found the equitable doctrines of estoppel and waiver are applicable to ERISA actions generally, and courts in this District have applied the doctrine of waiver to anti-assignment provisions in ERISA plans."  *Med. Socy. of N.Y.*, 2019 WL 1409806, at *10 (citation omitted); *see also Lauder v. First Unum Life Ins. Co.*, 284 F.3d 375, 382 (2d Cir. 2002) (finding "that waiver applies in the particular situation presented by this ERISA case" where the defendant "knew of [the plaintiff's] claim of disability, chose not to investigate it, and chose not to challenge it"); *Merrick*, 175 F. Supp. 3d at 120 ("[T]he doctrine of waiver is applicable to ERISA cases as a matter of federal common law." (citations omitted)).

"Waiver arises when a party has voluntarily or intentionally relinquished a known right."
*Merrick*, 175 F. Supp. 3d at 122; *see also Beth Israel Med. Ctr. v. Horizon Blue Cross and Blue
Shield of New Jersey, Inc.*, 448 F.3d 573, 585 (2d Cir. 2006) ("Because waiver of a contract right
must be proved to be intentional, the defense of waiver requires a clear manifestation of an intent
by plaintiff to relinquish her known right and mere silence, oversight or thoughtlessness in
failing to object to a breach of the contract will not support a finding of waiver." (citation and
quotation marks omitted)); *Marvel Ent. Grp., Inc. v. ARP Films, Inc.*, 684 F. Supp. 818, 821
(S.D.N.Y. 1988) ("[A] stipulation against assignment may be waived or modified by a course of
business dealings." (citation omitted)).

Plaintiff claims that Aetna waived the anti-assignment provisions based on 1) Aetna's
partial direct payment to Plaintiff and 2) Aetna's communication with Plaintiff.  (*See* Pl.'s Opp'n
9.)  Specifically, Plaintiff refers to Aetna's silence regarding the anti-assignment provisions
during the claims processing or appeals process, Aetna's direct communication with Plaintiff
before its provision of service and during the processing and payment of claims, and its
allowance of Plaintiff to submit claims on behalf of its patients.  (*Id.*)

First, an administrator's direct payment to a healthcare provider does not constitute a
waiver of the provisions "unequivocally preventing a Plan member / beneficiary from assigning
to any third party his right to sue."  *Neurological Surgery, P.C. v. Travelers Co.*, 243 F. Supp. 3d
318, 327, 330 (E.D.N.Y. 2017) (finding that an insurer's direct payment to a healthcare provider,
which the plan allowed the insurer to do at its discretion, did not constitute a waiver of
provisions prohibiting plan member from assigning his benefits).  "The Second Circuit has also
noted that '[n]ot all ERISA assignments convey the same rights,' and recognized the importance
of parsing the particular assignment at issue."  *Med. Socy. of N.Y.*, 2019 WL 1409806, at *11

18

(quoting *Rojas v. Cigna Health & Life Ins. Co.*, 793 F.3d 253, 258 (2d Cir. 2015)). Even if Aetna could be said to have waived its objection to a patient assigning to a service provider the right to receive direct payment for services, this "does not necessarily constitute a clear manifestation of the intent to allow a plan beneficiary to assign the right to contest the denial of a benefits claim through internal appeals or in federal court." *Id.*

Courts have found that administrators did not waive the anti-assignment provisions by their direct payment to providers, even where the administrator "was explicitly permitted to pay [providers] directly under the plan in its discretion." *Merrick*, 175 F. Supp. 3d at 122; *see also Am. Orthopedic & Sports Med. v. Indep. Blue Cross Blue Shield*, 890 F.3d 445, 454 (3d Cir. 2018) ("[I]ssuing payment at the out-of-network rate . . . do[es] not demonstrate an evident purpose to surrender an objection to a provider's standing in a federal lawsuit." (quotation marks and citation omitted)); *Advanced Orthopedics & Sports Med. v. Blue Cross Blue Shield of Mass.*, No. 14-CV-7280, 2015 WL 4430488, at *7 (D.N.J. July 20, 2015) (finding that direct payment did not constitute a waiver of the anti-assignment clause where the terms of the plan permitted such direct payment (collecting cases)); *Mbody Minimally Invasive Surgery, P.C. v. Empire Healthchoice HMO, Inc.*, No. 13-CV-6551, 2014 WL 4058321, at *3 (S.D.N.Y. Aug. 15, 2014) ("Health insurance companies routinely make direct payments to healthcare providers without waiving anti-assignment provisions.").

To give fullest effect to both provisions within the Plans, the plan administrator should be allowed "to exercise its expressly reserved discretion to pay out-of-network providers directly, without relinquishing its right to enforce an express restriction on assignment of benefits . . . ." *Med. Socy. of N.Y.*, 2019 WL 1409806, at *11. Thus, the Court agrees with the above cases in order to avoid "rewrit[ing]" the plans "under the guise of interpretation." *Burke*, 572 F.3d at 81.

The Court notes that some courts in this District have reached a different conclusion about the implications of a direct payment provision for an anti-assignment clause. *See, e.g., Biomed*, 2011 WL 803097, at *5 (holding that the defendant was "estopped from relying on the anti-assignment provision in light of [its] own long-term pattern and practice of accepting and paying on [the plaintiff's] direct billing" because the plan "either expressly authorizes patients to assign their claims to healthcare providers without [the defendant's] consent, or at the very least, creates an ambiguity within the contract that should be construed against the drafter."); *Protocare*, 866 F. Supp. at 761–62 ("Although the [p]lan does contain an anti-assignment provision, it also provides for the possibility of direct payment to the health care provider [and i]f the [p]lan had intended to prevent all assignments . . . then it would not have preserved the discretion to pay [the plaintiff] directly.").  However, Court finds these cases unpersuasive, because they did not give effect to the plain language of anti-assignment provisions.  The Court therefore finds that where the ERISA Plans expressly prohibit assignment, such as in the Deutsche Bank and FIT Plans, direct payment to the provider does not invalidate those provisions.  (*See* Deutsche Bank Plan 86; FIT Plan 62.)

As discussed above, the Fast Retailing Plan, the Altria Plan, and two TriNet Plans contained both anti-assignment clauses and direct payment provisions.  (Fast Retailing Plan 79; Altria Plan 59, 61; TriNet Plan (2014-15) 71, 74; TriNet Plan (2015-16) 68, 71.)  As the Court previously found, direct payments to Plaintiff under these Plans do not demonstrate waiver of the anti-assignment and written consent provisions.  So too in the wavier context, the Court elects to give effect to both provisions. *See Med. Socy. of N.Y.*, 2019 WL 1409806, at *9–10 ("Allowing a plan administrator to exercise its expressly reserved discretion to pay out-of-network providers directly, without relinquishing its right to enforce an express restriction on assignment of

benefits, gives fullest effect to these adjacent plan provisions."); *Merrick*, 175 F. Supp. 3d at 120–22 ("To find that [the defendant] implicitly waived the anti-assignment provision by acting pursuant to the direct payment provision is to create an ambiguity where none exists").  Thus, Aetna's partial direct payment to Plaintiff does not constitute waiver under the ERISA Plans.

The second question is whether Aetna's communications—or lack thereof—with Plaintiff constitute waiver.  Even if Aetna never raised the anti-assignment provision in its communications with Plaintiff, the caselaw suggests, and the Court agrees, these communications do not suggest that Aetna intended to waive its right under the provision.  *See Med. Socy. of N.Y.*, 2019 WL 1409806, at *12 ("But [the defendant's] 'mere silence' in the face of a request to reaffirm the anti-assignment clause cannot effectuate waiver."); *Travelers Co.*, 243 F. Supp. 3d at 330 ("Mere silence regarding the anti-assignment provisions does not constitute a waiver of those provisions."); *Merrick*, 175 F. Supp. 3d at 124 –25 & n.19 (finding that "mere silence may not establish waiver"); *Mbody Minimally Invasive Surgery, P.C.*, 2014 WL 4058321, at *3 ("That [the] defendants did not raise the anti-assignment provision at the time they denied or reduced payment is irrelevant because the anti-assignment provision was not a factor [in] determining the payment amount.  [The] [p]laintiffs' argument is simply another way of re-arguing that defendants waived the anti-assignment provision by making direct payments to plaintiffs—an argument courts have repeatedly rejected.").  Given that Aetna's argument on this Motion is that Plaintiffs lack standing, it is clear Aetna has not waived these provisions.  *See Travelers Co.*, 243 F. Supp. 3d at 330 (holding that administrator did not waive the anti-assignment provision when administrator's central argument was that the plaintiff lacks standing).  Nothing about the communication before the provision of services, during the processing and payment of claims suggest that Aetna treated Plaintiff as assignees of their

patients' benefit rather than as providers because Aetna has the discretion to pay directly. *See Merrick*, 175 F. Supp. 3d at 124 ("While [the defendant] requested documentation to support its previous payments and ultimately recouped payments from [the providers] for their failure to comply, nothing about these requests suggest that [the providers] were being treated as assignees of their patients' benefits rather than as providers [the defendant] has the discretion to pay directly."). Thus, the Court finds that Aetna did not waive its anti-assignment and written consent provisions.

### 5. Authorized Representative

As established above, Aetna neither consented to nor waived its right to assert any anti-assignment provisions. Plaintiff next argues that it derives standing as an authorized representative for at least three Aetna members, referred to as B.L., H.R., and H.S, who submitted a form which expressly authorized Plaintiff to act as their authorized representative. (Pl.'s Opp'n 11.)

Defendants argue that 29 C.F.R. 2560.503-1(b)(4) (the "Claims Procedure Regulation"), which provides claims procedures under ERISA, precludes Plaintiff from deriving standing as an authorized representative. (Defs.' Mem. 10.) Specifically, the regulation requires that claims procedures under ERISA must "not preclude an authorized representative of a claimant from acting on behalf of such claimant in pursuing a benefit claim or appeal of an adverse benefit determination." 29 C.F.R. § 2560.503-1(b)(4). Defendants argue that this provision refers to *internal* appeals, not litigation. (Defs.' Mem. 10.) Plaintiff counters that "litigation is one form of appeal of an adverse benefit determination." (Pl.'s Opp'n 11 (underline in original).) Thus, Plaintiff appears to argue that the Claims Procedure Regulation invalidates the anti-assignment provision in the ERISA Plans where members designate an authorized representative. (*See id.*)

Courts in the Second Circuit have held that a medical provider's status as an authorized representative does not negate an unambiguous anti-assignment provision, nor does it provide an independent cause of action under ERISA § 502(a)(1)(B). *See Med. Soc'y of N.Y.*, 2017 WL 4023350, at *13–14 (holding that plaintiff did not have a standing as an authorized representative and thus lacked a cause of action under ERISA without a valid assignment); *Park Ave. Aesthetic Surgery, P.C. v. Empire Blue Cross Blue Shield*, No. 19-CV-9761, 2021 WL 665045, at *7 (S.D.N.Y. Feb. 19, 2021) ("Courts that have considered similar arguments, have held that a medical provider's status as an [a]uthorized [r]epresentative does not negate an unambiguous anti-assignment provision, or otherwise independently provide a cause of action pursuant to ERISA § 502(a)(1)(B)."); *Aerocare Med. Transp. Sys., Inc. v. Int'l Bhd. of Elec. Workers Loc. 1249 Ins. Fund*, No. 18-CV-90, 2018 WL 6622192, at *8 (N.D.N.Y. Dec. 18, 2018) (holding that plaintiff's dealing with the defendants as an authorized representative did not negate an anti-assignment provision).

Although the Second Circuit has not ruled directly on this issue, district courts within the Third Circuit have held that a medical provider's status as an authorized representative does not provide a cause of action pursuant to ERISA § 502(a)(1)(B). *See Alkon on Behalf of GD v. Cigna Health & Life Ins. Co.*, No. 20-CV-2365, 2021 WL 822789, at *4 (D.N.J. Mar. 4, 2021), *reconsideration denied sub nom. Joseph D. Alkon, M.D., PC on Behalf of G.D. v. CIGNA Health & Life Ins. Co.*, No. 20-CV-02365, 2021 WL 3362562 (D.N.J. Aug. 3, 2021) ("This [c]ourt has repeatedly held that [the Claims Procedure Regulation] applies only to internal claims and appeals, not to federal lawsuits brought after the plan member exhausts those appeals."); *Cooperman v. Horizon Blue Cross Blue Shield of N.J.*, No. 19-CV-19225, 2020 WL 5422801, at *3 (D.N.J. Sept. 10, 2020), *reconsideration denied*, No. 19-CV-19225, 2020 WL 7264144

(D.N.J. Dec. 10, 2020), *and appeal dismissed sub nom. Ross Cooperman MD LLC v. Horizon Blue Cross Blue Shield*, No. 20-2899, 2020 WL 8921018 (3d Cir. Dec. 15, 2020) (same);  *Prof. Orthopedic Associates, PA v. Excellus Blue Cross Blue Shield*, No. 14-6950, 2015 WL 4387981, at *8 (D.N.J. July 15, 2015) (holding that the plaintiffs' reliance on the Claims Procedure Regulation is misplaced, as the "provision applies to internal submission of claims and appeals on behalf of beneficiaries, not civil lawsuits in federal court.");.

The Court joins the decisions of courts within the Second and Third Circuits and finds that Plaintiff's status as an authorized representative does not invalidate the ERISA Plans' anti-assignment or written consent provisions.

\*      \*      \*

In sum, for all of the reasons previously articulated, Plaintiff lacks standing in this case. Accordingly, Defendants' Motion To Dismiss pursuant to Rule 12(b)(1) is granted, and the Court need not consider Defendant's Motion To Dismiss pursuant to Rule 12(b)(6).

### III. Conclusion

For the foregoing reasons, Defendants' Motion To Dismiss pursuant to Rule 12(b)(1) is granted, and the Amended Complaint is dismissed.  Because Plaintiff has already amended its Complaint, the Amended Complaint is dismissed with prejudice.  *See Denny v. Barber*, 576 F.2d 465, 471 (2d Cir. 1978) (holding that the plaintiff was not entitled to "a third go-around"); *Melvin v. County of Westchester*, No. 14-CV-2995, 2016 WL 1254394, at *24 n.19 (S.D.N.Y. Mar. 29, 2016) (granting motion to dismiss with prejudice where "[the] [p]laintiff has already had two bites at the apple, and they have proven fruitless" (alteration and internal quotation marks omitted)).

The Clerk of Court is respectfully directed to terminate the pending Motion, (Dkt. No. 62), and close this case.

SO ORDERED.

DATED:      September 8, 2022
            White Plains, New York

_____
KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE

25